## NEW ORLEANS BOARD OF LIQUIDATION *v.* HART.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Submitted January 4, 1886.—Decided April 19, 1886.

The provision in the Louisiana Constitution of 1879, that the general assembly of the State should enact appropriate legislation to liquidate the indebtedness of the city of New Orleans and apply its assets to the satisfaction thereof, contemplated that provision should be made for the payment of the entire debt, whether bonded or floating, and was in harmony with the previously settled law of the State.

The holders of the floating debt of the city of New Orleans, existing at the time of the passage of the Act of the Legislature of Louisiana of April 10, 1880, known as No. 133 of that year, who have established the validity of their claims by judicial proceedings, are protected by the provisions of the Constitution of Louisiana adopted in 1879 from being excluded from shar-

ing in the proceeds of the property and fund which, by that act, were in terms appropriated to purchase and retire the bonds of the city.

The legislation of the State of Louisiana respecting the indebtedness of the city of New Orleans reviewed.

This was a petition for a mandamus. The case is stated in the opinion of the court.

*Mr. Henry C. Miller* for Board of Liquidation, plaintiff in error.

*Mr. H. J. Leovy, Mr. G. J. Leovy, Mr. E. D. White* and *Mr. J. P. Blair* for Sun Mutual Insurance Company, intervenor, plaintiff in error.

*Mr. E. H. Farrar* for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This was a petition in the name of the United States, on the relation of Judah Hart, a citizen of New York, for a mandamus to the Board of Liquidation of the city of New Orleans —a corporation organized under the laws of the State and having charge of the financial affairs of the city—to prepare and issue to him bonds of the city for the amount of his demand. The facts, as stated in the petition and found by the court, are briefly as follows: On the 3d of March, 1882, the relator recovered judgment in the Circuit Court of the United States against the city for $121,697.18, which drew interest from its date at the rate of five per cent. per annum. This judgment was founded on contracts for municipal purposes made from 1871 to 1877, inclusive. To review it the city sued out a writ of error from this court, but, as it did not operate as a supersedeas, the relator caused a writ of *fieri facias* to be issued, and levied upon certain moneys due and to become due to the city by the Canal and Claiborne Street Railroad Company and by the Orleans Railroad Company, and also upon the interest of the city in the New Orleans Sugar Shed Company and in the Orleans Sugar Sheds. Proceedings were taken to contest these seizures, but judgment was rendered in his favor, to review which the city sued out a writ of error together with a supersedeas.

While these cases were pending in this court, the relator and the city entered into a compromise, by which it was agreed, among other things, that she should dismiss the writs of error, and that he should renounce his seizure of the sugar sheds, apply the bonus due and to become due by the railway companies to the payment of his judgment, and fund the balance under the provisions of the act known as No. 67 of the legislature of the State of 1884.

Under the writ various sums were collected, which, on the 8th of July, 1885, had reduced the judgment to $76,194.62. The relator complied with the terms of the compromise on his part, and called upon the board to prepare and deliver to him bonds, under the provisions of act No. 67 of 1884, for the balance due on his judgment; but the board refused to comply with the demand.

The petition alleged that the city made no objection to the performance of this duty by the board, but that the board refused on its own account. The relator, therefore, prayed for an alternative writ of mandamus commanding the board to prepare and issue the bonds of the city, pursuant to act 67 of 1884, to the amount and value of the balance due on his judgment, and deliver them to him, and that the board be cited to answer his demand, and that upon the hearing the writ be made peremptory.

The board appeared and answered the petition, setting up that all the property of the city not dedicated to public use, and also the surplus of what was known as the *Premium Bond Tax*, were pledged, under act No. 58 of 1882, and by previous legislation, to the payment of other bonds of the city which were outstanding, and that the act of 1884, in so far as it directs a diversion of that property and fund, impairs the contract with the holders of those bonds, and is, therefore, unconstitutional and void.

By consent of parties, the Sun Mutual Insurance Company, as the holder of such outstanding bonds, intervened and joined with the Board in asserting the unconstitutionality of act 67 of 1884. The court granted a peremptory mandamus as prayed, and to review that judgment the case was brought here.

To understand clearly the position of the Board of Liquidation, and appreciate the ground of its refusal to issue the bonds, under act No. 67 of 1884, pursuant to the terms of the compromise, it will be necessary to refer briefly to the act of March 6, 1876, known as the Premium Bond Act, out of which the surplus of the premium bond tax arises, and to the act of April 10, 1880, to liquidate the indebtedness of the city and create the Board of Liquidation, as well as to the acts of 1882 and 1884.

The Premium Bond Act was an attempt to coerce creditors of the city to accept the plan proposed by her counsel for the payment of her indebtedness, by withholding from them all others means of payment of their demands. The city was at the time almost in a bankrupt condition, and the sums required to meet the interest on her admitted indebtedness rendered taxation not only burdensome but oppressive. The plan was to exchange all recognized and valid bonds of the city and of Jefferson and Carrolton, which had become incorporated with her, for premium bonds to be issued under the act. The latter were to be of the denomination of twenty dollars each, to be dated September 1, 1875, and to bear interest at the rate of five per cent. per annum from July 15, 1875, but not payable at any designated period. That, both as to principal and interest, was to be determined by a lottery. They were to be divided into series of one hundred each. A certain number of the series was to be drawn according to a prescribed schedule; and it would depend upon the number drawn whether a bond would be paid in one year or in fifty years.

The act forbade the levy of a tax for the payment of the principal or interest of any other bonds, repealed all laws requiring or authorizing the city to lay any such tax, and declared that it should be incompetent for any court to issue a mandamus to the officers of the city to levy and collect a tax for interest on other bonds. To meet the interest on the premium bonds and provide for other municipal wants, it further declared that a tax of only one and one-half per cent. per annum on the assessed value of property in the city should be levied, and that this limitation of her taxing power was a contract,

not only with the holder of them, but also with every resident and tax-payer, so as to authorize him to legally object to any higher rate of taxation. Under this plan premium bonds to the amount of $20,000,000 were prepared, of which a number equal to $13,263,300 was issued for other bonds. The remainder were not issued, because creditors refused to accept them. Holders of other bonds brought suits to compel the levy of a greater tax to pay them, pursuant to stipulations made, or implied at the time of their issue, that sufficient sums should be raised to meet the principal and interest on them. In those suits this court declared that the limitation upon the taxing power which the city possessed at the time the bonds were issued, and upon the faith of which they were taken, was invalid as impairing the obligation of her contract with the holders. *Wolff* v. *New Orleans*, 103 U. S. 358, and *Louisiana* v. *Pilsbury*, 105 U. S. 278.

Subsequently the city purchased with the proceeds of certain railroad franchises premium bonds to the value of $3,567,360, and under the operation of the plan a large number was extinguished, so that when the petition of the relator was presented there remained outstanding of those bonds only $7,918,-280. But, notwithstanding the reduction made at different times, the tax was levied annually for interest on the whole number prepared, thus creating an excess beyond the amount required.

The Constitution of Louisiana, adopted in 1879, ordained that the general assembly, at its next session, should enact such legislation as might be proper to liquidate the indebtedness of the city, and to apply its assets to the satisfaction thereof. Article 254. Under this requirement, and in supposed compliance with it, the general assembly, on the 10th of April, 1880, passed the act known as No. 133 of that year, creating a Board of Liquidation, investing it with exclusive control of all matters relating to the bonded debt, directing it to prepare bonds to be issued for negotiation or exchange, and with them or their proceeds to retire and cancel the entire valid debt of the city, *except the floating debt previously created*, and requiring the city authorities to transfer to it, as soon as possible

after its organization, all the property of the city, real and personal, not dedicated to public use.   The Board was empowered to dispose of the property and deposit the proceeds with its fiscal agent to the credit of the " city debt fund."

Nothing in the act was to be construed as affecting or in any manner impairing the premium bond act, but the city authorities were to transfer to the board all moneys collected on account of the tax levied in accordance with the provisions of that act, and the board was to apportion the proceeds and apply the same *pro rata*, and in the proportion which each form of bonded debt should bear to the entire amount of the city debt.   Such portions as should not properly belong to the outstanding premium bonds were to be applied to pay interest on the bonds to be issued.   The surplus from the collection of the debt and interest tax, or that arising from the sale of assets in the hands of the board, after paying such interest, was to be used to purchase and retire valid bonds of the city.

This act of 1880 did not cause the intended retirement and cancellation of the debt of the city.   No bonds were issued under its provisions, and the general assembly on the 30th of June, 1882, passed Act No. 58 of that year.   It recited that litigation had hitherto resulted disastrously for the tax-payer; that the creditors of the city had indicated a desire to settle their claims equitably, and to postpone the payment of certain bonds in order to lighten the burden of taxation: and that the constitution contemplated a definite termination of her embarrassment by special legislative enactments.   It authorized her, through the board, to extend for the period of forty years payment of all outstanding bonds other than premium bonds, at a rate of interest not exceeding six per cent., and to issue certificates drawing like interest for the unpaid coupons on outstanding bonds ·prior to the first of January, 1883, for which no judgment tax was levied, and to levy and collect a special tax to pay the interest on all bonds other than premium bonds and on the certificates for matured coupons.

The sixth section declared that all funds then, or that under existing laws might be, in the hands of the board should be deposited with its fiscal agent and credited to the City Debt Fund,

and that such fund should be applied *exclusively* to the purchase of outstanding bonds or coupons and the certificates therefor, which were extended to be retired under the act, except that the fund should first be used to pay the interest on the bonds and. the certificates.

The seventh section provided that the surplus, if any, of the premium bond tax of each year, or on hand at the passage of the act, after all the drawn series, interest and premiums thereon, exigible or due to the holders thereof had been provided for or fully paid, should also be deposited with the fiscal agent of the board on account of the City Debt Fund, and applied *exclusively* in payment of the interest on the outstanding bonds and certificates.

The tenth section declared that the act in all its parts was to be deemed and to constitute a valid and binding contract between the State, the city, its residents, citizens and taxpayers, and the holders of the bonds extended, and that the judicial process of the State, authorized by law or in force at the creation of the bonded debt, might be resorted to, and should be recognized and applied for the enforcement of its provisions in favor of any party showing just cause of complaint for their violation.    Under the act the board issued bonds exceeding $4,000,000, on which the interest has been paid, in part by the tax provided and in part out of the premium bond tax, there being a surplus of moneys collected by that tax beyond what was required for the interest on the premium bonds outstanding.

The act of July 9, 1884, known as Act No. 67 of that year, amends several sections of Act No. 133 of 1880.    It extends the authority of the board, and gives it exclusive control and direction over all matters relating not only to the bonded debt, but also to the judgment debt of the city.    Section three of the act of 1880, as amended, provides for retiring and cancelling the entire debt of the city then in the form of executory judgments, or which might thereafter become merged into them, except the floating debt or claims created for 1879, and subsequent years; and also for the preparation of bonds similar in their general character to those mentioned in the act of 1880,

to be exchanged for the judgments or sold, and the proceeds applied to their payment. The fifth section, as amended, provides, with greater particularity than the original section, for transferring to the board the property of the city not dedicated to public use, and its assets, realized and to be realized, except such assets and revenues as pertain to the administration of the city and are necessary for its support; and it authorizes and requires the board to dispose of the same, other than stock held in corporations, on such terms and conditions as it may deem best for the interests of the city, and to apply the proceeds, first, to the payment of the interest on the bonds authorized by the act, and, second, to their redemption and cancellation.

There is no doubt of the right of the relator under the act of 1884 to the bonds promised in the compromise with the city. His judgment is of the class of debts which it is made the duty of the board to retire and cancel by the exchange of the bonds provided, or by the sale of them and the application of their proceeds. The board refuses to issue them solely on the ground that the acts of 1882 and 1884 conflict as to the application of the property and funds of the city; the first act applying them to the payment of the bonded debt and certificates for matured coupons specified therein, and the second to the payment of bonds issued in cancellation of executory judgments against the city.

As seen by the preceding statement, all the property and funds of the city, and the excess of the proceeds derived from the tax for the interest on premium bonds beyond what was needed, were, by the act of 1880, pledged to pay her entire debt, except the floating debt previously created. This floating debt may have been as meritorious as the funded debt, and the duty to make provision for its payment equally binding. Why all the property and funds of the city should be appropriated to pay the latter debt to the exclusion of the former does not appear. The Constitution of 1879 contemplates that provision shall be made for the payment of the entire debt. It declares that the general assembly, at its next session, "shall enact such legislation as may be proper to liquidate the indebtedness of the city of New Orleans, and to apply its assets to

the satisfaction thereof;" and this means obviously the entire indebtedness in whatever form it exists, whether bonded or floating, and not merely a part of it. And the application of the assets of the city is to be in satisfaction of all the debts alike, and if not sufficient to extinguish them it is to be made in some ratable proportion. Such is, we think, the clear import of the constitutional mandate, and its purpose is in harmony with the settled law of the State, which has always recognized as sound and just the rule, that the property of the debtor should, as far as practicable, be appropriated to the payment of all his debts. The civil code, in force since 1825, declares that "whoever has bound himself personally is obliged to fulfil his engagement out of all his property, movable and immovable, present and future." Art. 3149. Although this provision does not in terms designate artificial persons, it embraces them within its scope. Whenever corporations, private or municipal, are permitted by the legislature to contract debts, they are brought equally with natural persons under the dominion of this law and are alike bound by it. The code also declares that "the property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes of preference." Art. 3150. The Supreme Court of the State, in the case of the *Succession of Taylor*, 10 La. Ann. 509, 510, in speaking of this last article, said: "We do not think this article of the code a mere idle recognition of an equitable principle, not intended to give the creditor any positive right to the property of his debtor. On the contrary, we think the whole of our legislation recognizes such an interest of the creditor in the property of the debtor as to give to the creditor the right to watch over this common pledge, and prevent the debtor himself from fraudulently parting with it."

This language was used in a case where a widow with minor children, left in necessitous circumstances, and not possessing in their own right property to the amount of $1000, undertook as administratrix to distribute that sum to herself and children, under a statute of the State, which allows a widow, in those circumstances, to receive from the succession of her deceased

father or husband that sum, or sufficient when added to their property to make that sum, and requires it to be paid in preference to all other debts, except those for the vendor's privilege, and the expenses in selling property.   The court held that the statute did not protect the property of the succession from creditors whose claims existed prior to its passage. The principle here asserted would undoubtedly cover the case at bar if the appropriation of the property and funds of the city to the payment of certain claims, to the exclusion of others equally valid, had been made by her voluntary act; but being made by direction of the statute, it may be questioned whether its validity, independently of the constitutional provision, could be successfully assailed.   The rule declared, however just in itself, can hardly be regarded as anything more than indicating the spirit which should control legislation in providing for the application of the property of a debtor to the discharge of his debts; although Mr. Justice Bullard of the Supreme Court of the. State, in *Atchafalaya Railroad & Banking Company* v. *Bean*, 3 Rob. La. 414, thought "it clear that the legislature cannot constitutionally, by any act subsequent to the creation of a debt, interfere to change or disturb the relation between debtor and creditor, or the relative rank of creditors *inter se;* and that two creditors who stood equal originally in the eyes of the law, and had an equal right to be paid, neither having any special lien or privilege over the other, must forever remain equal, notwithstanding any act of the legislature apparently sanctioning a different doctrine."

Property undoubtedly may be appropriated and special taxes pledged to meet future debts created for public purposes, but legislation would conflict with the spirit as well as the express letter of the code, if it authorized a municipal body to appropriate its entire property and revenues, except what might be required for the support of its government, to a class of existing demands over others equally entitled to payment.   So far as the indebtedness of the city, existing at the adoption of the Constitution of 1879, is concerned, we think the clause mentioned prohibits any such preference and appropriation.   We are, therefore, of opinion that holders of her floating debt existing

at the passage of the act of 1880, who had established its validity by judicial proceedings—and such is the position of the relator with his claim—cannot, under the Constitution of 1879, be excluded from sharing in the proceeds of property and funds which, by that act, are in terms appropriated to purchase and retire her bonds. The code recognizes, as we have seen, the justice of an appropriation of the property of the debtor for the payment of all his debts ratably. In the spirit of this equitable principle the Constitution of 1879 required that all the debts of the city existing at that time should be provided for, and any pledge of he rentire property and revenues to the payment of one class of her debts to the exclusion of others is repugnant to that instrument.

The act of 1882 did not change the position of the relator. It authorized the renewal and extension of outstanding bonds of the city other than premium bonds, and the issue of interest-bearing certificates for matured coupons, but the provision of the act of 1880 for transferring all the property of the city not dedicated to public use to the Board, creating a fund to purchase and retire her bonds, continued in force. It changed the application of the fund to the payment of the renewed and extended bonds and certificates for matured coupons, but it made no provision for the floating debt created previously to the act of 1880.

The act of 1884 amends several sections of the act of 1880, and as amended they are to be read from their passage as parts of that act. They provide that the property and funds of the city shall be appropriated to pay, first, interest on bonds issued to retire and cancel the debts of the city in the form of executory judgments, or which might become merged into such judgments, except the floating debt created after 1878; and, second, to redeem and cancel the bonds. It does not refer to the act of 1882; and we infer that the legislature intended, not to supersede all the provisions of that act for the payment of other bonds of the city, but to place on the same footing with them bonds issued for executory judgments. We must, therefore, construe it as extending the appropriation made by the act of 1882 to the payment of bonds issued for such judg-

ments, in addition to the payment of the bonds provided for by that act, and not as merely limiting it to the payment of such judgments.

The objectionable feature in all the previous acts is their attempt to do partial justice, by discriminating between creditors equally meritorious, and applying the property and funds of the city to the payment of some of them in preference to others. In our opinion this cannot be done. All creditors at the time the property and funds were appropriated were entitled, for the payment of their respective claims, when legally established, to share *ratably* in the proceeds of the property and funds. The relator, with his judgment against the city, has a right to stand, with reference to those proceeds, on an equal footing with her other creditors, notwithstanding that by the terms of the act of 1882 he is excluded from all participation in them; and, to enable him to do so, he can demand the bonds of the city for the balance due him, pursuant to the compromise with the municipality. With the bonds he will not have any preference over other bondholders, but will be entitled to share ratably with them in the proceeds of the property appropriated for the payment of their bonds. The judgment ordering a mandamus is therefore,

*Affirmed, but with instructions to the court below to modify its directions, as to the payment of the bonds issued, in accordance with this opinion.*

Sun Mutual Insurance Company *v.* United States *ex rel.* Judah Hart. The same judgment and for like reasons will be entered on the intervention of the Sun Mutual Insurance Company as in the case between the original parties.    *Affirmed.*