## No. 10,002.

## STATE EX REL. SAMUEL WOOD VS. BOARD OF LIQUIDATION OF THE CITY DEBT.

The premium bond plan included all the *bonded* debt of the city of New Orleans of date antecedent to the adoption of the premium bond act in 1876; but it did not include any part of the city's *floating* debt.

Act 58 of 1882 included all of the city's bonded debt, other than that which had been funded into premium bonds.

Acts 31 of 1876 and 58 of 1882 operate as contracts between the city and her bonded creditors, and were based upon adequate consideration.

The surplus of the premium bond tax beyond the requirements of holders, other than the city, received its destination to the retirement of outstanding bonds, not funded into premium bonds by the terms of the premium bond act in 1876, antecedent to the adoption of the Constitution of 1879, and this covenant was but re-affirmed and re-announced in Act 58 of 1882.

There is a conflict between the provisions of Section 4 of Act 67 of 1884 and that of Section 7 of Act 58 of 1882, both of them having the common object of dedicating to two different classes of city debts *the* surplus of the premium bond tax.

Persons who deal with political or municipal corporations possessed of limited power to contract debts, *must* rely for their payment upon the annual revenues provided for them by law, in the absence of any special statute authorizing the creation of a contract therefor.

Any *posterior* law which has for its object to confer on such creditors as originally possessed no contract rights the prerogatives of those who had, and thereby infringes the latter, is amenable to the objection of impairing the obligation of protected contracts.

A PPEAL from the Civil District Court for the Parish of Orleans.
Monroe, J.

W. S. Benedict for Relator and Appellant.

Leovy & Blair and H. C. Miller for Respondent and Appellee.

The opinion of the Court was delivered by

WATKINS, J.   This is a proceeding by mandamus on the part of a holder of bonds of the city of New Orleans, bearing date July 1, 1884, and which were issued under and in pursuance of Act 67 of 1884, to coerce the Board of Liquidation to comply with its terms, and particularly with those of Sections 3 and 4.

Relator avers that it is the respondent's duty to apply, in the manner therein specified, the revenues, property and assets of the city to the payment of the interest and the redemption and cancellation of. the capital of his bonds.

He further avers that it is the duty of respondent to advertise for sealed proposals for the exchange of *drawn premium bonds in the possession of the city* for the bonds issued under said act to the amount of $50,000, *after each allotment of series ;* and that as said statute has been in force since the date of its passage, on the 9th of July, 1884, and all the bonds in contemplation thereof have been issued, there should now be advertised for exchange, in accordance with Sections 3 and 4 of said act, for the various series allotted after that date, and regularly hereafter, bonds to the amount of $50,000 to each allotment of series within that time.

He further avers that the respondent is in possession of funds in excess of the interest due on said bonds, and, also, in excess of the amount that is necessary to carry out the provisions of said act, and its failure to do so is a plain violation of law and an impairment of his contract in the sense of the State and Federal Constitutions.

The respondent's return is elaborate, and we make the following synopsis of it, viz :

That the premium bonds were given in exchange for other valid bonds of the city that were issued under laws anterior in date to the enactment of the premium bond act, on the 6th of March, 1876, and which pledged and dedicated to their payment adequate and sufficient taxes.

For their discharge, on the premium plan, a five mill tax was authorized and consecrated thereto, and on the faith of it they were

surrendered and funded to the extent of $13,000,000, and of which there are extant about $8,000,000 at this time.

That the premium bond act provided that this bonded debt aggregating $20,000,000, when exchanged for premium bonds of $20 each, should be divided into 10,000 series of 190 bonds each, the whole to be numbered from 1 to 10,000. That a certain amount of those series should be annually paid, in pursuance of an allotment made from the numbers of all the series, and that premiums should be awarded on the bonds of the drawn series in a similar manner.

That, as all of said bondholders had not participated in the plan and funded their bonds, all of the series drawn at the different allotments did not pass into the hands of holders, but near $8,000,000 thereof remained in the possession of the city; that the premium bond tax, to the extent it would have been applied to *its* proportion of the premium bonds, constituted, in contemplation of the premium bond act, a *surplus* represented by the *drawn* premium bonds in the possession of the city, and that this surplus was, by the terms of the act, dedicated to the payment of these unfunded bonds, or exchanged therefor.

That the bonds contemplated by the premium bond act were binding contracts between the city and bondholders, and the adequate and sufficient taxes dedicated to their payment by the laws under which they were issued were enforceable and valid.

That in 1882 the Legislature made further provision for those unfunded bonds by authorizing the issuance of another class of bonds therefor, known as extended consolidated and certificate bonds, to the payment of which an *additional* five mill tax was dedicated, and said surplus of the premium bond tax was pledged; that on the faith of said pledge and dedication $5,000,000 of same were exchanged therefor, and are still extant, and solely dependent thereon for payment and to which they have a vested right.

That of said bonds there are remaining unfunded, under either act, $3,000,000, which are *still* entitled to claim the benefits of both and to participate in said tax and surplus, and which right the Legislature by any *subsequent* act is impotent to impair or take away.

That, in pursuance of the statutes of 1876 and 1882, the city has levied and is annually levying a one per cent tax for the exclusive benefit of *all* of said bondholders, whether their bonds have been funded or not; and, as it is charged with the custody and application of the proceeds thereof, it is wholly without power to divert them to any other object.

That Act 67 of 1884 provides for the issuance of bonds into which

are to be funded *judgment* or floating debts—as contradistinguished from *contract* or *bonded* debts—aggregating $900,000 in amount, the greater part of which has been created since 1873, and no part of which was contracted prior to 1870, which was originally entitled to no special or sufficient tax for their payment, but which were wholly dependent upon the adequacy of the annual revenues for their discharge, and which are not entitled to participate in the one per cent tax.

That said act, in providing for an exchange of *drawn* premium bonds in the possession of the city for said floating debt bonds, undertakes, in effect, to appropriate to the latter *in advance of their maturities* the said surplus to the extent of $200,000 annually, or $500,000 for the time which has elapsed since the passage of the act, to the prejudice of the *contract* creditors of the city ; and that this will the more clearly appear from the fact that respondent has in hand neither funds or property of the city—such as is mentioned in the act—with which to pay any part of said floating debt bonds.

That the amount of the premium bonds to be annually paid is annually increasing in value, and hence the proportion of the five mill tax applicable to the payment of each succeeding drawn series thereof is annually increasing to such an extent that the aggregate yearly excess is less than $80,000 ; therefore, if *drawn* premium bonds in possession of the city are given in exchange for floating debt bonds to the amount required, not only would the surplus be consumed, but the proceeds of the premium bond tax would be absorbed, and the premium bond holders and the holders of bonds not funded would be deprived of the amount annually due them therefrom.

Finally, the respondent returns that the Act of 1884 is, in effect, an attempt to divert and misapply the one per cent tax in contravention of the pledges contained in prior laws, and, is enforced, contracts made in pursuance thereof will be impaired in the sense of the State and Federal Constitutions.

The Sun Mutual Insurance Company intervened and joined the respondent in resisting the enforcement of the Act of 1884.

It claims to be the holder of certain extended, consolidated and certificate bonds of 1882; and contends that, if said act is carried into effect, its contracts under various other and prior laws, enacted in 1852, 1854, 1869, 1870, 1871, 1873 and 1876—under which the bonds given in exchange were authorized and issued—as well as those under

the law of 1882, would be impaired and violated, and said bonds depreciated in value to the amount of $5000.

It also claims to be the owner of certain premium bonds, and if said act is enforced, its contract rights, under the premium bond act, will be likewise impaired and said bonds depreciated in value to the extent of $5000.

It further avers that, by the terms of said statutes—all of which were enacted prior to 1879—the State of Louisiana and the city of New Orleans- contracted with the bonded creditors of the latter to provide a *sufficient* tax for their payment.

That the undertaking, on the part of the State, acting for the city, as set forth in sections 5 and 6 of Act 58 of 1882, to levy a five-mill tax for the *exclusive* benefit of the bonds issued thereunder and others which were issued under prior laws, and not yet funded, was in furtherance of the contract rights created thereunder, and that its pledge of the surplus of the premium bond tax to the payment thereof was in further fulfillment of same.

That to said five-mill tax and surplus said bondholders not only had and have a vested right, but they give an adequate consideration therefor in surrendering their old bonds, the payment of which was secured by an adequate tax, and in extending their payment for forty years, and that the exchange contemplated by the Act of 1884, if enforced, would impair its contracts in the sense of the Constitution and the law.

As a part of its petition it adopted the averments of the respondent's return.

Its alternate prayer is that, in the event the desired relief is granted the relator, its contract rights, under prior laws, be protected.

Hence, the grounds of the respondent's and intervenor's resistance to the demands of the relator may be summarized as follows, viz :

*First*—That the debts of the city for which the bonds of 1884 were issued were floating debts, which were created under the general laws of the State, which made no other provision for their payment than such as may be contained in the annual revenue laws.

*Second*—That the premium bond plan only included the *bonded* debt of the city, contracted under special statutes, enacted prior to the passage of the Premium Bond Act in 1876, and which provided sufficient and adequate taxes for their payment.

*Third*—That the five-mill tax provided in the premium bond act was dedicated to *all* such bonds, whether exchanged for premium or not; and that the five-mill tax provided by Act 58 of 1882, and the

surplus of the premium bond tax were pledged to the bonds issued thereunder and others that still remained unfunded.

*Fourth*—That if the provisions of the Act of 1884 are enforced, as demanded by the relator, the vested rights of the bonded creditors— those who have not funded their bonds, as well as those who have— will be divested and their contract rights impaired.

I.

From the record we have obtained the following statement of facts, viz :

That the amount of the bonded indebtedness of the city that was included in the premium bond plan was about $20,000,000 in capital alone.

Of this amount there were exchanged for premium bonds the sum of $13,263,300.

They were issued under the following several statutes, viz :

Act 40 of 1833, Act 71 of 1852, Acts 108 and 109 of 1854, Act 49 of 1869, Act 7 of 1870, Acts 48 and 100 of 1871, Act 73 of 1872, and Acts 71 and 103 of 1874.

Of the remainder of the bonds not funded into premiums $3,259,000 were funded into forty-year bonds under Act 38 of 1882, and there remained a surplus of bonds—not funded under either act—aggregating $2,988,400 which are still extant.

The amount of premium bonds in the hands of third persons, other than the city, is $7,418,240.

The annual yield of the one per cent tax for the four years antecedent to 1887 was as follows, viz :

For 1883, $960,240 ; for 1884, $947,950 ; for 1885, $994,480 ; for 1886, $849,100.

The total amount of funds in the hands of the respondent on the 1st of March, 1887, derived from the one per cent tax was $294,000, subject to a reduction for unpaid interest on the bonded or contract debts to that date, $130,000, and it has *no other assets* in hand except some shares of New Orleans Waterworks stock.

There has been required annually, for the redemption of premium bonds and drawn premiums in the hands of holders, *other than the city*, about $400,000, and this amount has been, and still is, under the premium bond plan, annually increasing, so that the yearly surplus applicable to *drawn* premium bonds in the possession of the city, is less than $80,000, and it is annually diminishing in amount.

At the first drawing that occurred in 1887, the city drew thirteen

404          SUPREME COURT OF LOUISIANA.

State ex rel. Wood vs. Board of Liquidation.

series, representing $26,000 of premium bonds, while there were drawn by third persons extant forty-seven series, representing $94,000 of premium bonds and $16,000 of premiums—the whole being equal to $110,000.

At this ratio they would be entitled, under four quarterly allotments in 1887, to $440,000 ; hence, the surplus applicable to *drawn premium bonds in possession of the city* would be only $50,000.

The annual interest on the bonds issued under the Act of 1882 and on the unfunded bonds of years antecedent to 1876, aggregates $564,000, therefore, the surplus of the premium bond tax of 1887, if applied thereto—less the amount of the five-mill tax—would leave a deficit of $40,000.

The floating debt of the city was incurred in years subsequent to 1870, and was to be paid out of the revenues of the respective years in which it was so incurred, and when there was an insufficiency of money on hand to pay same when presented, certificates were issued payable out of the revenues of said years when collected, and such certificates evidence the floating debt.

The amount of the judgment or executory debt—representing in great part the floating debt—funded into bonds under Act 67 of 1884, is $980,000.

II.

From this state of facts the following propositions may be taken as clearly established, viz :

1. That the premium bond plan included *all the bonded* debts of the city prior in date to the passage of Act 31 of 1876, but that it did not include any part of the city's *floating* debt.

2. That Act 58 of 1882 included all of her bonded debt other than that represented in the premium bonds.

3. ·That all of those bonds were issued in pursuance of particular laws enumerated, and which authorized and directed the levy of sufficient taxes to meet them.

4. That Acts 31 of 1876 and 58 of 1882 operate as contracts between the city and her bonded creditors, and were based on an adequate consideration.

5. That as there is, approximately, an annual surplus of the premium · bond tax of less than $80,000, applicable to the drawn premium bonds in the possession of the city, the bonds funded under the act of 1884—if relator's demand be granted—would not only absorb it, but would absorb a large proportion of that tax that is applicable to *drawn premium bonds, and premiums held by third persons.* Relator's demand

NEW ORLEANS, APRIL, 1888. 405

State ex rel. Wood vs. Board of Liquidation.

being for *drawn* premium bonds, he would, if successful, be entitled to *immediate* payment of the *whole* amount, as soon as the exchange should be consummated. If it was for *undrawn* premium bonds, the consequence would not be so serious.

### III.

Section 3 of Act 67 of 1884 is couched in the terms following, viz:

"That for the further redemption of said bonds, the said Board of Liquidation is hereby authorized and required, *after each allotment of series* following the passage of this act, to advertise for sealed proposals for the exchange of *drawn* premium bonds in the possession of the city, for the bonds authorized herein, to the amount of $50,000 of said bonds," etc.

Now, as there are four allotments of series annually, the bondholders under that act would be entitled to exchange their bonds annually for $200,000 of *drawn* premium bonds, and they would be entitled to $500,000 thereof since the date of the passage of the act.

The effect of this plan, if enforced, would be to enable the holders of such bonds to realize the capital and interest within a few years, whereas the holders of consolidated and certificate bonds must wait ten and forty, and the holders of premium bonds must wait fifty years; *i. e.*, if the one per cent tax were sufficient to pay them all. But we have seen that it would not—the annual requirements of the 1884 bonds being $200,000; that of the drawn premium bonds held by third persons $440,000; that of the extended and unfunded bonds $564,000; and the one per cent tax only yielding about $990,000. There must, of necessity, be an annual deficit of about $215,000 —an amount in excess of that demanded annually for the bonded creditors of 1884.

Not only is this true, but, if the entire amount of $500,000 demanded by the relator is allowed him, the entire proceeds of the premium bond tax would be insufficient to meet it—the same being $495,000—and all the bonded or contract creditors would be deprived of *any* participation therein, for at least one year; and of a large portion thereafter, until the $980,000 of 1884 bonds should be fully paid.

In this manner the premium bond plan of 1876 would be impaired, if not annihilated, and so would the extended debt scheme of 1882.

But, perhaps, the most serious objection to the act of 1884 is, that it tends to *prefer* floating-debt bonds, not bottomed on any contract, to bonded debts of the city, and thus impairs the latter's contract rights. It thus confers upon a class of creditors, holding evidences of debt, primarily unsecured, and having only the right to collect their claims from any *balance* there might be of the annual revenues of any partic-

ular year, not only the right to the proceeds of *a* special tax, but to *the* particular tax dedicated to contract creditors, who had made important concessions to obtain it—and years before.

This is attempted and insisted upon, in the face of the following provisions of Section 7 of 58 of 1882, viz: " That the *surplus* proceeds, if any, of the premium bond tax of each year, remaining in the hands of the Board of Liquidation of the city debt, or surplus on hand at the time of the passage of the act, after the drawn series, interest and premiums thereon, exigible or due to the holders thereof, have been provided for, or fully paid, shall also be deposited with the fiscal agent of the said Board, to the credit of the account known as 'the city debt fund,' and applied *exclusively* as provided in section five"; *i. e.,* " to the *objects and purposes of this act.*"

There is a conflict between the provisions of the act of 1882 and the provision of Section 4 of Act 67 of 1884, which authorizes and requires the respondent " to advertise for sealed proposals for the exchange of *drawn* premium bonds in possession of the city." Both have *exclusive* reference to the surplus of the premium bond tax, and, as we have satisfactorily shown, it cannot meet both.

Section 4 of Act 67 of 1884 manifestly impairs the contract of the bonded creditors of the city as recognized and established under Section 7 of Act 58 of 1882.

Persons who deal with political or municipal corporations possessed of limited power to contract debts, must rely for their payment upon the annual revenues provided for them by law, in the absence of any special statute authorizing the creation of a contract therefor.

Any *posterior* law which has for its object to confer on such creditors as originally possessed no contract rights the prerogatives of those who had, and thereby infringe the latter, is amenable to the objection of impairing the obligation of their protected contracts, and cannot be enforced by mandamus.

### IV.

But our attention has been attracted to the opinion of the Supreme Court in New Orleans Board of Liquidation vs. Hart, 118 U. S. 136, *et seq.,* and it is relied upon by counsel for relator as announcing a contrary interpretation of the statutes which are drawn in question here, in determining a question similar to the one now before us.

The one under consideration in that case was the right of the relator, Hart, to have his executory judgment funded into bonds, in pursuance of the provisions of Section 2 of Act 67 of 1884, it being " founded on *contracts,* for municipal purposes, made from 1871 to 1877."

To his demand the respondent board interposed, as an objection to their issuance, " that all the property of the city not dedicated to public use, and, also, the surplus of what is known as the premium bond tax, were pledged, under Act 58 of 1882, and by previous legislation, to the payment of other bonds of the city which were outstanding; and that the act of 1884, *in so far* as it directs a diversion of *that property and fund*, impairs the contract with the holders of those bonds, and is, therefore, unconstitutional and void."

The Court made a careful analysis of those statutes, and stated their conclusions thereon, and from which we make the following extracts, viz:

" There is no doubt of the right of the relator, under the act of 1884, to the bonds promised in compromise made with the city. His judgment is of the class of debts which it is made the duty of the board to retire and cancel by the exchange of the bonds provided, or the sale of them, and the application of their proceeds.    *    *    *

"As seen by the preceding statement, all of the property and funds of the city *and* the excess of the proceeds derived from the tax for the interest on the premium bonds, beyond what was needed, were, by the act of 1880, pledged to pay her entire debt, *except the floating debt* previously created. This floating debt may have been as meritorious as the funded debt and the duty to make provision for it equally as binding. Why all the *property and funds* of the city should be appropriated to the latter debt, to the exclusion of the former, does not appear.

" The Constitution of 1879 contemplates that provision shall be made for the payment of the entire debt. It declares that the General Assembly, at its next session, shall enact such legislation as may be proper to liquidate the indebtedness of the city of New Orleans and to apply its *assets* to the satisfaction thereof; and this means, obviously, that the entire indebtedness in whatever form it exists, whether bonded or floating debt, and not merely a part of it. And the application of the *assets* of the city is to be in satisfaction of all the debts alike,". etc.

From the foregoing it is evident to our minds that the court dealt with the question of the proper application of the " *assets* " and "the *property and funds* of the city," and not with the surplus of the premium bond tax.

For it will be observed that the point of resistance in that case was " that the act of 1884, in so far as it directs a diversion of *that property and funds*, impairs the contract," etc.

No question was made by the respondent upon the score of the premium bond surplus.

It will be likewise observed that the court, when speaking of *what* was dedicated, both "the property and funds of the city" *and* "the excess of the proceeds" of the premium bond tax were included; but, in treating of what was *applicable* to the payment of the city's indebtedness, the phrase "property and funds of the city" was alone employed.

This theory is demonstrated by the reasoning of the court, which immediately follows our quotation, predicated upon the article of our code which declares that "whoever has bound himself personally is obliged to fullfil his engagement out of all his *property, movable and immovable*, present and future," R. C. C. 3149; and, also, on the article which declares that "the *property* of the debtor is the common pledge of his creditors, and the proceeds of the *sale* must be distributed among them ratably, unless there exist some lawful cause of preference. R. C. C. 3150.

It is manifest that a tax is but a forced contribution levied *upon* property of the citizens for the purposes of government, and is, in no sense, *property* of the corporation.

As such, it does not respond to the articles cited, nor to the argument and reasoning of the court.

This conclusion is fortified by the concluding paragraph of the opinion, viz:

"With the bonds he will not have any preference over other bondholders, but will be entitled to share ratably with them in the *proceeds of the property* appropriated for the payment of their bonds."

The reasoning and argument of the court was directed at Section 3 of Act 67 of 1884, which provides "that it shall be the duty of the city of New Orleans to turn over and transfer to the Board of Liquidation, immediately after the passage of this act, all the *property* of the city, real and personal," etc., for the purposes thereof.

But that section is entirely eliminated from *this* controversy, because the proof discloses that the respondent is is possession of no "property or funds" of the city which are applicable under that section to any of the debts of the city. The *sole* question here is, whether or not the Legislature had the power to dedicate the surplus of the premium bond tax to bonds that were to be issued under Section 2 of Act 67 of 1884. We are of the opinion that it had not.

In treating of the purpose and effect of the premium bond act we said, in the Rivet case, that the tax was denominated "the premium

bond tax," and was separately mentioned on the tax rolls and in the tax receipts; and that the law "provided that any *surplus* arising from the requirements of the plan and all *drawn* series and premiums falling to the city should be used in the retirement of *outstanding bonds not funded into premiums*."

We styled this a legislative, reciprocal and synallogmatic contract between the city and her bonded creditors. R. C. C. 1765; 35 Ann. 134, Rivet vs. City of New Orleans.

Hence, it is apparent that the surplus of the premium bond tax, beyond the requirements of the holders of premium bonds, and in possession of the city, received *this particular distinction* by the premium bond act prior to the adoption of the Constitution of 1879.

This, the State for the city, had a perfect right to do. In the act of 1882 this contract was but re-affirmed and re-announced. It cannot be questioned now. The contrary provisions of the act of 1884 must yield and be treated and considered as not written in so far as they are concerned. The judge *a quo* correctly declined to make the alternative writ of mandamus peremptory.

Judgment affirmed.

## CONCURRING OPINION.

FENNER, J. The most perplexing problem that has confronted this Court has been the adjustment of the rights and obligations of the city of New Orleans and her creditors under the State Constitution of 1879.

That constitution contained the broad provision: "No parish or municipal tax for all purposes whatsoever shall exceed ten mills on the dollar of valuation."

At the time of its passage the city owed debts exceeding twenty millions of dollars, arising mainly out of antecedent contracts, provision for which, in accordance with their stipulations would, at the time, have required an annual tax far exceeding the limitation fixed, leaving not a cent for the necessary support or alimony of the city.

Considering that the Constitution did not terminate the corporate existence of the city of New Orleans, but obviously contemplated its continuance as a going municipal corporation, the conclusion was irresistible that the ten mills tax authorized therein was designed, primarily and to the extent necessary, to be applicable to the support or alimony of the city, and that no creditor or other person could interfere with its appropriation to such purpose.

On the other hand, the State Constitution was utterly incompetent

to impair the obligations of antecedent contracts protected by the Constitution of the United States or to withdraw the powers of taxation applicable to their satisfaction at the dates of said contracts, which powers, under the settled jurisprudence of the United States Supreme Court, were read into and formed part of the contracts.

We, therefore, held that the powers of taxation possessed by the city was derived from two sources, viz:

1. From the State Constitution to the extent of ten mills, which was primarily applicable, so far as necessary, to the alimony of the city.

2. From valid legislative authority existing at the date of valid prior contracts, forming part thereof, irrepealable because protected by the Constitution of the United States, and, therefore, continuing to exist until the contracts shall be discharged. Saloy vs. City, 33 Ann. 1879.

We held, further, however, that the constitutional limitation was absolutely destructive of the rights of every creditor to exact a higher rate of taxation for the satisfaction of his debt, unless his right was founded on antecedent *contract* protected from impairment by the Constitution of the United States.

Hence, where a judgment creditor, on a cause of action founded in tort, and not in contract, sought to invoke a higher rate of taxation possessed by the city at the date of his judgment, we denied his claim; and this decision was affirmed by the Supreme Court of the United States. State ex rel. Folsom vs. Mayor, 32 Ann. 709.

The foregoing have been the germinal principles, according to which we have determined the rights of all classes of the city's creditors, guided throughout by a close adherence to the decisions of the Supreme Court of the United States. State ex rel. Moore vs. City, 32 Ann. 736; Taxpayers vs. City, 33 Ann. 79; State ex rel. DeLeon vs. City, 34 Ann. 477; Rivet vs. City, 35 Anm. 134; Carriere vs. City, 36 Ann. 687; Marchand vs. City, 37 Ann. 14; N. O. Gas Light Co. vs. City, 37 Ann. 436; Thorn vs. City, 37 Ann. 528; Labatt vs. City, 38 Ann. 283.

The sole question presented for our determination in the present case is the validity of the section 4 of act No. 67 of 1884, which directs the application of drawn premium bonds in the possession of the city to the redemption of bonds issued under the same act in taking up the floating debt of the city.

In view of the provisions of the premium bond act, dedicating the entire tax levied thereunder to the then existing bonded debt, whether

funded into premiums or not so funded, and absolutely requiring said tax to be employed exclusively "in the execution of the provisions of this act" (section 11); in view of the unequivocal provisions of act 58 of 1882, devoteing the entire surplus of the said tax to the payment of the interest and principal of the bonds issued thereunder in exchange for the unfunded bonds; and in view of the consistent jurisprudence of this court that the premium bond tax could not be evaded, diminished or diverted from the purposes to which it was devoted by the act itself—the question presented would hardly possess the slightest seriousness, but for the inferences drawn by plaintiff from a decision of the Supreme Court of the United States in the case of Hart vs. Board, 118 U. S. 136.

The chief opinion just read demonstrates very satisfactorily that the Supreme Court did not consider or deal with this particular question, and had not the slightest intention of thus overturning the jurisprudence of the State, destroying the vested rights of the bonded creditors and deranging and undermining the entire settlement of the city's bonded debt.

In the cases of Moore and Rivet, 32 Ann. 736, and 35 Ann. 134, we exhaustively analyzed the premium bond act, and we held that while those features thereof which impaired the contract rights of non-funding bondholders were absolutely null and void, yet that the rights of funding bondholders who had accepted the proposition and had exchanged their bonds for premiums were equally entitled to protection. We maintained the validity of the act as a contract with the funding bondholders entitling them, under all circumstances, to require the city to levy the entire tax provided therein and to apply it as directed by the act; but we held, at the same time, that the rights of non-funding bondholders were not affected thereby, but remained intact, as if the premium bond act had never been passed.

We have never allowed the premium bond act to affect in the slightest degree the rights of non-funding bondholders, or of any other antecedent contract creditors. Thus, in De Leon's case, 34 Ann. 477, where a holder of other bonds issued at a time when the city's power of taxation *for general purposes* was fifteen mills, we allowed the necessary tax, saying: "Although the city may levy ten mills for its alimony and five mills for the premium bonds, the latter is not to the prejudice of the right of relator to have a tax levied within five mills to the extent necessary to satisfy his contract."

We applied the same principle in the cases of Carrière, Marchand and Thorn (36 Ann. 687; 37 Ann. 14, and 37 Ann. 528), all of which

were proceedings for the enforcement of contracts other than bonds, or part of the floating debt, passed prior to the constitutional amendment of 1874.

In Rivet's case we said in analyzing the premium bond act: "It imposed on the Council the duty to levy annually a tax, * * which, after the year 1881, was to be at least one-half of one per cent; it provided that the tax so levied should constitute *a special fund to be used for no other purpose than the carrying out of the plan;* * * it provided that any *surplus* arising above the requirements of the plan and all drawn series of premiums falling to the city *should be used in the retirement of outstanding* BONDS *not funded* into premiums."

In another part of the same opinion we said: "Under the law as it exists the city is *required* to invest the part coming to her in retiring unfunded *bonds.* If it be desired that such portion should be applied to the payment of interest on *bonds* other than premiums, and thus reducing the tax necessary to pay such interest, application should be made to the Legislature—certainly not to the judiciary."

From the foregoing, it conclusively appears that the premium bond tax was a special tax intended to create a special fund, dedicated and applicable, *ab origine*, exclusively to the then existing *bonded* debt of the city, so dedicated as a stipulation of a valid contract which neither the State nor city could impair; that its imposition and application affected in no manner the rights of other creditors, which remained precisely as if the act had never been passed; and that the unbonded creditors had not and could not acquire any right to, interest in, or control over the special fund arising from this special tax, because irrevocably dedicated exclusively to the bonded debt.

Now the Act 58 of 1882 was an exercise of the legislative power in exact accord with the suggestion made by us in the Rivet case above quoted, at least in so far as it dealt with the surplus of the premium bond tax and the drawn premiums held by the city. These special funds were applicable exclusively to the unfunded bonds, and nobody but the bondholders had any right or interest in them.

Any voluntary agreements between the city and the bondholders as to the disposition and application of these funds in accordance with their destination would be valid and binding, because they were the sole parties in interest and the only ones whose rights could be affected.

The Act 58 of 1882 is fully analyzed in the chief opinion just read, and it exhibits a contract between the city and her bondholders perfectly binding as to the application of the premium surplus and

drawn bonds, of which nobody can complain except non-consenting bondholders, who raise no voice against it, and which neither the city nor State can impair.

The attempt of the State, in the subsequent act of 1884, to divert these special funds to the satisfaction of the city's unbonded debt is a flagrant attempt to impair the obligations of antecedent valid contracts, which, we are very certain, the Supreme Court of the United States, with a proper understanding of the case, would never sanction, and which our duty, under both the State and Federal Constitutions, forbids us to countenance

The floating debt of the city of New Orleans is divided into two classes : 1. That originating prior to the constitutional amendment of 1874. 2. That originating after said amendment.

The first class, so far as founded on contract, can suffer nothing by our decision herein, because it is entitled to satisfaction by taxation. Carrière's case, 36 Ann. 687 ; Marchand's case, 37 Ann. 14 ; Thorn's case, Id. 528.

The second class is not a *debt* of the city, at all, but a mere claim on the uncollected revenues of the years in which they were incurred, and entitled to satisfaction from no other source. Taxpayers' case, 33 Ann. 79 ; Gas Light Company's case, 37 Ann. 436.

It is, to say the least, doubtful whether the word *indebtedness*, as used in Art. 254 of the Constitution, embraces these claims, and whether, under Art. 45, the General Assembly has power to fasten such claim upon the city as debts. See Labatt's case, 38 Ann. 283.

But it is not necessary to consider these questions in this case, and they are only referred to for the purpose of showing that the major portion of the so-called floating debt dealt with in the act of 1884 is far from being equally *meritorious* with the bonded debt, or even equally binding in law.

All the judges concur in this opinion as well as in the chief opinion.